ASBURY LIFE INSURANCE COMPANY *vs.* AUGUSTUS B. WARREN *et als.*

Franklin, 1876.—December 12, 1876.

*Evidence. Juror.*

When the bodily health of any person is material to be proved, the representations of such person of the nature, symptoms and effects of the malady under which he is laboring at the time, are admissible as original evidence.

But if such representations are made to an unprofessional man they must be confined to the usual and natural expressions of a present existing condition of health and not include such as are a narrative or statement of past feelings or condition.

A person who has expressed a belief that one who has been convicted and sentenced for a criminal offense, has been sufficiently punished therefor, and has signed a petition for his pardon, is not competent to sit as a juror for the trial of the same person in a civil action against him founded upon the same charge.

ON EXCEPTIONS, to the exclusion of evidence and on motion of the plaintiffs to set aside the verdict, which was for the defendants.

CASE, to recover money obtained of the plaintiffs through a conspiracy of three defendants wherein they defrauded the plaintiff company by procuring from them a policy upon the life of a person far gone in pulmonary consumption, representing that at the time of procuring the policy she was in health and free from any disorder.

The policy was taken out October 3, 1873, for $3,000, on the life of Serecta Anna Warren, an unmarried sister of the defendant, Dr. Warren, in whose family she occasionally resided, the assurance in case of death, payable to him.

Miss Warren died December 28, 1873 ; and there was paid on the policy, July 1, 1874 by the plaintiffs to the defendant, Doctor Warren, $2,979, which they seek to recover in this action.

The evidence showed that Dr. Warren signed his sister's name to the application for the policy, that the defendant, Luther Curtis, signed as a witness to her signature, that after the money was deposited in bank for the payment of the policy, the defendants disagreed as to its application, the defendant, Reuben Fenderson, the agent of the company in procuring the insurance, insisting that he should be paid one-third of it for his share, but finally compromising his claim by taking $300. The defendant, Curtis, also received some of the money which he claimed was in payment of former indebtedness of Warren to him and on account of services in recovering the money and in the settlement of the claim of Fenderson.

There was evidence introduced by the plaintiffs tending to show that Miss Warren had during the summer and fall of 1873, been sick, and to prove that fact, they offered one Abby Howes, her intimate friend, to testify to the declarations made by Miss Warren about her health, physical diseases, disorders and maladies, to Miss Howes at the time she was laboring under and suffering the same ; also offered two letters written by Miss Warren while at New Sharon to Miss Howes, one dated September 15, 1873, and one dated October 14, 1873, and received by Miss Howes at Augusta, Maine, by due course of mail, in which were

statements concerning her health, physical condition and maladies under which she was then and there laboring; also offered to prove by Betsey Churchill, who was the nurse and attending upon said Serecta Anna during the last ten hours of her life, her declarations during that time and after she was conscious that she could live but a short time, concerning the cause of her then present sufferings and the length of time they had existed, all of which evidence was excluded by the presiding justice. The verdict was for the defendants, and the plaintiffs alleged exceptions.

They also filed a motion to set the verdict aside as against law, evidence and its weight, and because of the disqualification of a juror.

The facts bearing upon the motion are that at the September term of this court, 1874, for Franklin county, an indictment was found against the same defendants for the same conspiracy and Warren and Curtis were tried thereon at the March term thereafter, found guilty and sentenced to imprisonment, the defendant, Fenderson in the meantime having died. After Warren and Curtis were sentenced, petitions for the executive pardon of Curtis were circulated and numerously signed in Franklin county, of the form following:

"To his excellency the Hon. Nelson Dingley, jr., governor of the state of Maine: The undersigned, citizens of Farmington, in the county of Franklin, being persons well acquainted with Luther Curtis, now confined in Auburn jail for the crime of cheating by false pretenses, believing that he has been sufficiently punished; that the ends of justice do not demand that he should be longer incarcerated, and invoking the mercies of executive clemency, hereby petition your excellency for the immediate and unconditional pardon of the said Luther Curtis, and as in duty bound will ever pray."

Among the grounds stated in favor of the motion is the following,

"IV. Because James Cutts, one of the jurors who was summoned as a talesman to serve on the panel which tried and returned a verdict in this case, was not legally qualified to serve thereon in said trial for the following reason:

"Said juror, having been summoned as aforesaid, was interro-

gated by the counsel for the plaintiffs, as follows : 'Have you signed any papers or petitions to any persons or parties for the relief of either or all of these defendants since their conviction ?' meaning the conviction of the defendants for the crime of cheating the plaintiffs by false pretenses.   To which interrogatory said juryman answered, 'I have not ;' when, as matter of fact, said juryman had heretofore, to wit : on or about the first of December last, signed a petition to the governor and council for the pardon of Luther Curtis, one of said defendants, which fact the plaintiffs and their attorneys were ignorant of till after said verdict, which facts the plaintiffs are ready to verify ;" etc.

Cutts afterwards deposed that he did sign the petition some little time after their commitment, that he remembered that the question was put to some of the jurors, whether they signed the petition referred to, but did not recollect that the question was put to him.

*T. W. Vose,* for the plaintiffs.

*H. L. Whitcomb,* for the defendants.

DANFORTH, J.   On the third day of October, 1873, the defendant, Warren, procured of the plaintiff company a policy of insurance payable to himself, upon the life of his sister, Serecta Anna Warren.   The policy was issued upon an application purporting to have been signed by the assured and his sister, in which the health of the said Serecta was fully set out and described in answer to questions therein propounded.   Very soon the said Serecta died, and upon proof of the death the company paid the amount due, and now seek to recover it back on the ground of fraudulent representations, in which it is alleged that all the defendants were participants.   These alleged fraudulent representations consist mainly in the answers found in the application relating to the health of the person to be insured.   In order to establish these allegations, the plaintiffs offer certain declarations of the said Serecta, relating to her health at or about the time of the application, and others made just before her death, for the purpose of showing the falsity of the answers in the application.

These declarations offered and rejected were of two classes, first

those which relate to, and are descriptive of her health and feelings at the time they were uttered ; and second, those "concerning the cause of her then present sufferings, and the length of time they had existed." We think those properly coming under the first class should have been admitted.

Usually such testimony comes from a party, and is offered in his own behalf. In this case it comes from one who was neither a party to the record, nor in interest, one who, if she had been living, would have been a disinterested witness pecuniarily. Still the same principles apply in either case. The health of the person whose life was insured, was the ground upon which the policy was issued, and a true description of it was necessary to the validity of the contract.

If the action were upon the policy, it might have been sufficient to show the representations false. In this case it is necessary to go one step further, and bring a knowledge of it home to the defendants, to show that they were participants. In either case, the truth of the representations is in issue, and the principles applicable to the testimony upon this issue the same.

The general rule applicable to such cases would make this testimony hearsay. But to this rule there are many exceptions, and when the declarations come within any exceptions they become original testimony. When the fact of such a declaration having been made is to be proved regardless of its truth, it is original testimony necessarily. When an act of a third party is material, and has more or less weight according to the motive which prompted it or the purpose for which it was done, under well known and established principles of law, any cotemporaneous declarations explanatory of that act are admissible as a part of it. The same principle will apply when it is material to prove the physical health or bodily or mental feeling of any person.

In this case it became important to prove the condition of health in which the said Serecta was at the time of the application. Witnesses testified as to certain indications of ill health. These indications may have a slight or a deep foundation, or may be entirely illusory. What she may have said in explanation of them at the time has universally been regarded as *res gestæ* and, as

such, original evidence. Greenleaf, in his work on Evidence, vol. 1, § 102, states the rule thus : "Wherever the bodily or mental feelings of an individual are to be proved, the usual expression of such feelings, made at the time in question, are also original evidence." In the same section he says : "So, also, the representation by a sick person, of the nature, symptoms, and effects of the malady, under which he is laboring at the time, are received as original evidence."

It is particularly to be noticed that in this definition the declarations are such as are "made at the time in question," and relate to the "malady under which he is laboring at the time."

In *Bacon* v. *Charlton*, 7 Cush. 581, 586, Bigelow, J., says : "The rule is now well settled, and it forms an exception to the general rules of evidence, that where the bodily or mental feelings of a party are to be proved, the usual and natural expressions of such feelings, made at the time, are considered competent and original evidence in his favor." In *Insurance Company* v. *Mosley*, 8 Wall. 397, the rule with its limitations and restrictions is fully stated and settled in accordance with the other authorities cited. The rule itself seems now to be settled beyond question ; the only difficulty is in its extent and application. In the case last cited the principle seems to have been carried to the extreme limit, and so far that two of the judges in a very able opinion by Clifford, J., dissented in part.

The principle as laid down by Greenleaf and Bigelow, above cited, was not questioned, but its application to certain declarations as to the cause of the injury, was denied in the dissenting opinion, while the court admitted the declaration on the ground that it was so near the time, and so connected with it by the circumstances developed, that it was in fact a part of the thing to be proved. *Ashland* v. *Marlborough*, 99 Mass. 47, is to the same effect. So also, *Jacobs* v. *Whitcomb*, 10 Cush. 255.

Is the rule sufficiently extensive to cover the declarations in relation to the "cause of her then present sufferings, and the length of time they had existed ?" From the testimony we learn that these declarations were made a few hours before her death, and after she became conscious that she could not live, and relate

to her condition, not at the time when made, but some time previous, and before the date of the application for the policy. They contain undoubtedly important testimony, as bearing upon the issue. But in no sense can they be considered as part of the *res gestæ*. They were not the "natural expression" of her then condition, but simply a narrative of that condition as it was at some previous time. Bigelow, J., in *Bacon* v. *Charlton*, above cited, says : "Such evidence, however, is not to be extended beyond the necessity on which the rule is founded. Any thing in the nature of narration or statement is to be carefully excluded, and the testimony is to be confined strictly to such complaints, exclamations and expressions as usually and naturally accompany, and furnish evidence of, a present existing pain or malady."

In *Emerson* v. *Lowell Gas Light Co.*, 6 Allen, 146, it was held that "a plaintiff's narrative of past events, though made to his attending physician, are incompetent evidence in his favor."

There is undoubtedly a distinction to be made between declarations made to an attending physician, and such as may have been made to others ; much more liberality is to be allowed in the former case than in the latter. This is allowed on the ground of their necessity, to enable the physician to form an opinion as to the true condition of the patient, as well as because the professional man is less liable to be deceived than others. But even in such case it is rather to show the reasons and foundation of the medical opinion, than as substantive proof of the facts stated. *Barber et ux.* v. *Merriam*, 11 Allen, 322. But the limits of the rule under discussion are so clearly laid down by Clifford, J., in his dissenting opinion in *Insurance Co.* v. *Mosley*, that it is unnecessary to pursue the discussion further. It is clear that the rule itself is not sufficiently broad to cover the second class of declarations offered, while the principles upon which it is founded, and the limitations to it, established by the decisions, will exclude them.

But it is claimed, that as the application was produced by the defendants, with Serecta's name attached to it, thereby giving it her sanction, the plaintiffs should be permitted to put in her subsequent conflicting statements to prove its falsity. But she was

in no sense a witness. The defendants had procured the application either with or without her genuine signature, and passed it to the company vouching for its truth; and, so far as this question is involved, it is immaterial whether the signature was hers or otherwise. They not only vouched for its truth, but one of them at least authorized the inference that it had her sanction. If she ever had any interest in it, that interest ceased as soon as it passed from her. Whether it passed from her as true or false, she could certainly have no stronger relation in the transaction, to those receiving it, the defendants, than that of vendor or assignor. In such case, it is well settled that her subsequent declarations cannot be received to impeach that to which she has given currency; and this would be quite as true, if it never had had her sanction. In either case she would have stood in the same relation as any other person competent to be a witness, but whose declarations not under oath, and without an opportunity of cross-examination, are subject to all the infirmities of hearsay testimony. The declarations of a vendor after the sale cannot be received to impeach his title, or that of his vendee. *Greene* v. *Harriman*, 14 Maine, 32. *Fisher* v. *True*, 38 Maine, 534. *Bartlet* v. *Delprat*, 4 Mass. 702. 1 Greenl. Ev., § 180. *Hatch* v. *Bates*, 54 Maine, 136.

In opposition to these cases we have that of *Aveson* v. *Lord Kinnaird*, 6 East. 188, cited and relied upon in the argument. This case, so far as the question under discussion is concerned, is like the present and fully sustains all that is claimed for it. It is cited in *Gilchirst* v. *Bale*, 8 Watts, (Pa.) 355, as authority for the doctrine there enunciated though the latter case does not go so far as the former. It is also cited in many more modern cases with approbation and without any suggestions that the principles sustained are in any respect to be limited or qualified. In an earlier case that of *Climer* v. *Littler et al.*, 3 Burr. 1244, where a question arose as to which of the two wills should be established as the true one, the later was in the hand writing of William Medlicott, who had possession of both, and was also a subscribing witness to the last one. This Medlicott on his death bed took the earlier will from his bosom and delivered it to his sister, saying "it was the

true will," and at the same time declared that the later will "was forged by himself." The sister was a witness and testified to these acts and declarations without objection. Upon a motion for a new trial, it was objected that this testimony should not have been received. But Lord Mansfield, after alluding to the fact that it came in without objection, said, "as the account was a confession of great iniquity, and as he could be under no temptation to say it, but to do justice and ease his conscience; I am of opinion the evidence was proper to be left to the jury." This case would certainly seem to have a decided tendency to support the principle established in *Aveson* v. *Lord Kinnaird*, in its full extent.

But a more careful examination of it will very much detract from its force in that respect. Both wills were in the possession of Medlicott, and had by him been secreted, and the competency of the testimony is made evidently to rest very much, if not mainly, upon these facts. In the opinion it is further said in relation to the first will, "it was necessary to show how it was secreted, and how it was discovered; the declaration of Medlicott in his last illness, when he delivered it for the use of the plaintiff, is allowed to be competent and material evidence;" and of the last, "the instrument of 1745, it was equally in his custody and secreted. The account he gave of it in his last moments, is equally proper." We think, therefore, the decision may be sustained upon the ground that the declarations were a part of the *res gestœ*, and does not afford much aid to *Aveson* v. *Lord Kinnaird*, in sustaining the principle under discussion.

In *White et ux.* v. *Holman*, 12 Maine, 157, 160, Weston, C. J., after analyzing *Aveson* v. *Lord Kinnaird*, says, "in our opinion, no general principle can be extracted from a case, so peculiar in character."

In *Stobart* v. *Dryden*, 1 Mee. & W. 615, it was *held* that declarations made by a deceased attesting witness, respecting the attested instrument, are not admissible in evidence, though admissions of fraud or forgery on his own part, and though his handwriting has been proved as proof of the instrument, and *Aveson* v. *Lord Kinnaird*, was overruled.

Thus it will be seen that the last named case so far as it author-

izes the declarations of past transactions, feelings and facts, whether for the purpose of proving the past state or condition of health of the person making them, or of impeaching an instrument to which such person by his acts or signature had given credit, is contrary to well established principles and nearly all the authorities to which our attention has been directed.

The result is that, such declarations of the said Serecta, as were descriptive of her state of health at the time they were made, and were "such complaints, exclamations and expressions as usually and naturally accompany and furnish evidence of a present existing pain or malady," as were offered and excluded, should have been received. While the second class offered, relating as they did to her past condition, and being "in the nature of narrative or statement," were properly excluded. It is to be understood that in order to make such declarations admissible, it must first appear that at the time when made, her condition as to health was a material fact to be proved.

We do not mean to intimate an opinion that it may not be material to prove the nature of the disease of which she died; and in proving that, such declarations as come within the principle indicated may be admissible. If from such proof it should appear, that her death was caused by such a disease as must necessarily have existed from a period anterior to the date of the application, or by a fair inference may be considered as having a bearing upon her condition at that time, we see no objection to its use for that purpose.

There is also a motion in the case to set aside the verdict because it is against the law and the evidence, and "because James Cutts, one of the jurors, who was summoned as a talesman to serve on the panel which tried and returned a verdict in this case, was not legally qualified to serve thereon in said trial."

It appears from the testimony that two of the defendants, Warren and Curtis, had prior to the trial in this case been convicted under an indictment for the same offense as that charged in the writ, and had received their sentence therefor. The testimony also satisfactorily shows that the juror, Cutts, had signed a petition for the pardon of Curtis on the ground that "he has been sufficiently

punished" and that on being interrogated in regard to the matter
he denied it.   Whether this denial was from a want of memory or
otherwise does not appear ; nor is it necessary that it should.  It was
a fact material for the counsel for the plaintiff to know and which
was kept from him.   If the juror had in writing expressed a be-
lief in the defendant's guilt or innocence it would not probably have
been claimed that he was possessed of that entire impartiality
which is proper in the trial of a cause.  A much more serious objec-
tion as we think lies when, as in this case, the opinion is not only
entertained that his punishment has been sufficient but expressed
in writing and that writing made known at least to the friends of
the defendant and especially such as have made manifest the most
interest in relieving him from any further penalty.  In the former
case the mind, certainly of a candid man, would still be very much
influenced on listening to the testimony and if decided might be
expected to be controlled by it.   But in the latter case it is hardly
conceivable that the testimony should have any effect whatever.
The guilt is admitted and it is believed that the punishment
already suffered is adequate to the crime and after such an exhibi-
tion, how shall the juror justify himself to the friends of the accused
if he should assent to a verdict of guilty.   It is true that the crim-
inal and civil liability for the same offense are entirely distinct ;
but this hardly mends the matter and may perhaps make it worse.
The prosecutors in the civil action would almost certainly be
looked upon as the complainants in the criminal, and the result
would be that the plaintiff would be looked upon as at least
attempting to push the matter to the extent of the law without
regard to justice; and thus on the part of the juror, prejudice
against the plaintiff would be added to sympathy for the defen-
dant.   We think a person thus situated could hardly possess that
impartiality which the law requires in a juror ; and he certainly
would not inspire that degree of confidence which it is very desira-
ble the parties should have in the tribunal which tries their causes.

The verdict in this case is so clearly against the testimony that
it would be difficult to account for it upon any other ground than
that the jury failed to comprehend the distinction between a civil
and criminal proceeding upon the same charge, and thus the plain-

tiffs' rights, as well as the defendants' liabilities, appear to have been overlooked or ignored.

*Exceptions and motion sustained.*

APPLETON, C. J., DICKERSON, BARROWS, VIRGIN and LIBBEY, JJ., concurred.